UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
SEP - 4 2015
AT____ O'CLOCK____
Lawrence K. Baerman, Clerk - Syracuse

| | |
|---|---|
| CHARLES CRABLE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Case No.: |
| | ) 5:15-CV-1084 (BKS/ATB) |
| PREMIER BATHS, INC. | ) |
| d/b/a PREMIER CARE IN BATHING, and | ) |
| BILL KELLY, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT AND JURY DEMAND

Plaintiff, Charles Crable, appearing *pro se*, alleges as follows:

### I. JURISDICTION

1. This is a civil action seeking damages. Jurisdiction is conferred on this Court by the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* and 28 U.S.C. §§ 1331, 1337, and 1350. Venue is proper in the Northern District of New York because a substantial part of the events giving rise to the Plaintiff's claims occurred in this district.

### II. PARTIES

2. At all relevant times, Plaintiff Charles Crable, was and is a resident of Cortland County in the State of New York.

3. At all relevant times, Defendant Premier Care in Bathing ("Premier") is a Florida corporation employing more than 25 people. Premier was, at all relevant times, licensed to do business, and was and is doing business, by virtue of the laws of the State of New York, and in Cortland and all counties in the State of New York.

1

4. At all relevant times, Defendant Bill Kelly was and is a resident of the State of Rhode Island.

## III. FACTUAL ALLEGATIONS

5. Plaintiff commenced employment as a sales representative with Defendant Premier on July 31, 2014. At all times during his employment with Defendant Premier, Plaintiff competently and diligently performed his duties. Plaintiff was regularly complimented verbally and in writing from Defendant Bill Kelly and Premier Vice President Gary Reda for a job well done. Plaintiff won bonuses and awards from Premier beginning the first month of employment. Plaintiff was terminated on October 17, 2014.

6. Premier required that Plaintiff work out of his own established home office to work with Premier selling walk-in bathtubs to the aged and disabled. There were equipment requirements, such as a computer with Internet connection, hardwired telephone, long-distance telephone, fax machines, printer, and an iPhone to receive messages and orders while in the field selling the walk-in bathtubs.

7. All appointments were made by Premier and were emailed or faxed to Plaintiff's home office the night before the appointment. Any changes or new instructions were communicated from the company to Plaintiff. Plaintiff was required to return to the same appointment often three times or more. These orders were usually given by Defendant Kelly, but occasionally others from Premier would call Plaintiff to tell him where to drive next if a change were necessary. Plaintiff was required to use his own vehicle to travel from appointment to appointment.

8. Only Premier would contact the homeowner. Plaintiff was forbidden from having the client's telephone number.

9. Contrary to the promises made by Defendant Kelly, Plaintiff was required to drive very far distances outside the described boundaries as described by Defendant Kelly. Plaintiff was promised a maximum one-way boundary of 80 miles from Plaintiff's home office. The appointments all made by Premier and communicated to Plaintiff primarily by Defendant Kelly were to be scheduled in and around central New York State.

10. Unfortunately, from Plaintiff's home office, it was not unusual to be told to drive 120 miles or more. On one particular day, Plaintiff was required to drive a 400-mile round trip. Both appointments were to old mobile homes.

11. During training, which was held in Rhode Island for three days, Plaintiff was informed by another sales rep named Bobby that Defendant Kelly writes his own business. Moreover, Bobby stated that Kelly writes business in New York State. Manager Bill Kelly only told Plaintiff he would travel to Texas for weeks at a time for recruiting and training. Plaintiff began to ask questions.

12. The main questions Plaintiff would ask occasionally is why there are no appointments in or near the Plaintiff's home office area as promised. This after the Plaintiff had driven to each and every appointment required by Premier, most 100 miles or more and, nonetheless, having a good measure of success.

13. The Plaintiff sold over $60,000 worth of business during his first month earning more than $6,000 in commissions. The records will show the actual addresses and locations the Plaintiff had to drive. In spite of his success, the Plaintiff noticed a pattern with no appointments, save one or two out of more than a total of 100 in his territory including Binghamton, Ithaca, and Cortland.

14. Possessing a good background, well educated, and formerly running his own business, the Plaintiff understood the effect of charges made for false advertising. The client wanted the bath unit or perhaps just the information. In September, suddenly most of the appointments made by Premier and funneled through Manager Bill Kelly were of very low quality. Many were in dilapidated mobile home parks or so far out with very meager incomes and home values. But the company had to respond to the leads or risk being accused of false advertising. Mr. Crable never refused or complained but only asked why none were in more lucrative areas like Ithaca, yet still made the drives.

15. A scheduler named Daniel at Premier informed the Plaintiff that Manager Bill Kelly determines who gets what leads and reserving better leads for himself since he continually does business in New York State.

16. In spite of the Plaintiff's immediate and continued success with Premier, he began to realize why he was hired in the first place.

17. It became clear that the Plaintiff was simply hired to run the leads that Manager Bill Kelly did not want to take, i.e., the old mobile homes, rough neighborhoods, far outlying areas and other low quality leads with little or no chance for a sale. The Plaintiff was hired to protect Premier and address all the bad leads, contrary to the promise of solid leads within 80 miles.

18. The Plaintiff requested the original signed contract on several occasions including in two emails. They were both ignored by manager Bill Kelly. The Plaintiff never received the signed contract.

19. The Plaintiff's commission schedule was dropped from 12 to 10 and from 7 to 5 lacking notice, with no explanation from Manager Bill Kelly. There were no complaints

of any kind from Bill Kelly or Premier while the Plaintiff continued to do an outstanding job.

20. Again, the Plaintiff requested the signed contract which was never forwarded. In that email and subsequent telephone calls the Plaintiff told Bill Kelly that his actions and those of Premier seemed illegal and contrary to any agreement. Further, the Plaintiff gathered information from the New York State Department of Labor. That was communicated to Bill Kelly on October 16th, 2014.

21. The next day, on October 17, 2014, the Plaintiff was terminated. The only notice was the inability to log on to his appointments. Plaintiff's funds were withheld totaling over $5,000 for more than 7 months.

22. Vice President Gary Reda sent the letter with no explanation other than the fact that the Plaintiff was terminated and he would send the monies owed the Plaintiff upon installation. The units were already installed. That never happened.

23. If the Plaintiff had not complained to various agencies, there is no question that he would have never gotten any of the money owed him. As it is there is still a balance of more than $2,000 that they are again choosing to ignore. The Plaintiff complained to the New York State Department of Labor, which investigated the Plaintiff's claim for unemployment insurance. That process took more than 5 months to complete. Premier did not cooperate with the Labor Department and chose to hold the Plaintiff's funds 7 months until June of 2015. Some funds were never paid and are still owing. Premier demonstrated acts of continuous fraudulent behavior and disregard for the law.

24. Premier contested the ruling from the Department of Labor twice and was rebuked each time. The ruling is that the Plaintiff was a bona fide employee.

25. Further, the Department of Labor concluded that Premier had not only broken New York State law but federal laws as well.

26. On May 22nd, 2015, Premier Bath defaulted on the hearing before Administrative Judge Steven Kittleman. Premier was provided an extra 45 days to lobby the Appeal Board. They never responded during that time frame. The time is now up.

27. Premier obviously was hiding behind the "terminate at will" concept however the 'never received' contract was deemed null and void as the Plaintiff was clearly an employee and not an Independent Contractor. Premier chose the illegal activity to not pay unemployment fees, worker's compensation, FICA fees, IRS taxes, Social Security, Medicare and other costs for the Plaintiff. The Plaintiff was left with paying all the taxes and other costs as well. The Plaintiff was used by Premier Care in Bathing.

28. Premier Bath didn't want to play by the rules and expected to take an unfair advantage over other companies by misclassifying the Plaintiff and perhaps others.

29. Misclassification is a very serious crime on both the federal and state level, some company executives have gone to jail and paid fines. This case is no different other than the fact that this was intentional and malicious, harming the Plaintiff very profoundly in many ways. The Plaintiff lost many opportunities due to the illegal activities of Premier Care in Bathing. Premier Care in Bathing knew they were breaking the law. Moreover, the named defendants violated both federal and New York State public policy. The Plaintiff's written request for a copy of the signed contract and explanation of the commission reduction, absent any notification and Plaintiff's subsequent appeal to the New York State Labor Board, was met with clear and immediate retaliation. Premier Care in Bathing terminated the Plaintiff within 12 hours for asking relevant questions.

30. In New York State, the initial determination of unemployment can have the same effect as an 'adverse audit,' once it is upheld by the administrative judge. This case was upheld by the Administrative Judge, Steven Kittleman on May 22, 2015 and again by default of Premier Care in Bathing on July 11th, 2015.

31. The Plaintiff is informed and believes he was singled out, misused and abused as a lackey to carry out the work for Manager Bill Kelly in particular and Premier Bath in general to protect their marketing and advertising interests. Further, based upon so called jokes by Manager Bill Kelly the Plaintiff is informed and believes that he was singled out due to age and possibly ethnicity. Manager Bill Kelly is Caucasian and the Plaintiff is African American.

32. The Plaintiff was gainfully employed and left his previous position to take the job and promises offered by Premier Bath, Inc. and Manager Bill Kelly. Further, Plaintiff informed Manager Bill Kelly, based upon his background, the job fits well and this could be his last career. Bill Kelly stated the walk-in bath sale is "just a simple conversation" with no traditional presentation or demonstration. He also stated the Plaintiff could work for Premier Care in Bathing for many years and was anxious to have him on board.

33. The Plaintiff's reputation has been irreparably damaged and he could not find suitable employment. A termination, for any reason or none, stays with one lifelong. The damage is profound.

34. Due to the difficult circumstances Premier Bath has put the Plaintiff into, the embarrassment, lack of available funds while bills came due and a certain reduction in social stature has cause tremendous stress and Emotional Distress for the Plaintiff.

35. Premier Bath has shown itself not only to be wantonly lawless but capricious, egregious, vile, corrupt and self-serving.

### IV.   CAUSES OF ACTION
### Fair Labor Standards Act ("FLSA")
### Failure to Pay Wages and Overtime Compensation
### Against All Defendants

36. The foregoing paragraphs are incorporated herein as if set forth in full.

37. At all relevant times, Defendants have and continue to be "employers" within the meaning of the FLSA.

38. At all times relevant herein, Defendants were responsible for paying wages to Plaintiff.

39. At all times relevant herein, Plaintiff was employed with Defendants as an "employee" within the meaning of the FLSA.

40. Defendants' violations of the FLSA include, but are not limited to, unlawfully failing to pay hourly wages due to Plaintiff and unlawfully failing to pay overtime wages due to Plaintiff.

41. Defendants' conduct in failing to pay Plaintiff properly was willful and was not based upon any reasonable interpretation of the law.

42. As a result of Defendants' unlawful conduct, Plaintiff has suffered damages as set forth herein.

### V.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court enters judgment against Defendants, and each of them, for:

a) Unpaid minimum wages, overtime wages, penalties and interest;

b) Liquidated damages pursuant to the FLSA;

c) General, compensatory, and special damages;

d) Punitive damages;

e) Reasonable fees and costs;

f) Such other and further relief as the Court deems just and proper.

DATED: 9-1-15

Respectfully submitted,

Charles Crable, Pro Se
Plaintiff



**LEGAL SERVICES OF CENTRAL NEW YORK**

*Making Justice Accessible*

Mary E. Traynor, Esq.
Staff Attorney

472 South Salina Street, Suite 300 • Syracuse, NY 13202
PH: (315) 703-6549 • OFFICE MAIN: (315) 703-6500
TOLL-FREE: (866) 475-9967 • FX: (315) 475-3126
EMAIL: mtraynor@lscny.org • www.lscny.org  2706

A member of the
JUSTICE ALLIANCE

GRABLE
5529 ST. RT. 221
CINCINNATUS, NY
13040

JAMES HANLEY FEDERAL BUILDING
100 SOUTH CLINTON STREET, SUITE 750
SYRACUSE, NEW YORK 13261

ATTN: CLERK OF THE COURT

U.S. DISTRICT COURT
LAWRENCE K. BAERMAN, CLERK
SEP -4 2015
ED

